Next case will be 081053 Baychar v. Burton Corp. Mr. Kepler? Yes. Take the podium please. Good morning, your honors. I'm here this morning with my colleague, Mr. Daniel Simpson, the Director of the Law Firm of Gallup, Johnson & Newman. I've reserved five minutes for a rebuttal, and Mr. Simpson will be taking the rebuttal. What I'd like to talk about today is trust and privilege. For example, I also want to welcome Judge Hylston. It's good to see someone from another bench here, and I trust that they briefed you about the weather before you came here, so you were prepared for not being in Northern California. It's also a privilege for me to be here. This is the second time that I've been able to argue before this court in the last two months, and it's a privilege also because it's my first argument and my second argument before this court. It's something that I feel is quite a privilege. It made me think about going back to law school, what we learned in law school, the excitement of law school, graduating from law school, taking a bar exam. Mr. Kepler, I would like to warmly welcome you back for your second visit, but we do have a limited amount of time this morning, so if you just get to the point of the arguments you want to make. Very good. When it comes to the issue of privilege, when we become members of a court, we're privileged to become officers of that court. When I talk about trust, there are certain documents that are used in our process in which we're supposed to be able to trust the statements made in those documents. I put myself in the position of my previous counsel in this case at the district court level, and he was faced with a motion for summary judgment in which one of the issues was the date of invention of the Herman patent. So he, in preparing for his response to the motion for summary judgment, I'm sure that he had discussions with his client, and in those discussions, the client said, well, you know, I actually invented that earlier. I have an earlier date of invention. And then the counsel below thought that, well, you know, here I have the privilege to be an client that when my client makes a statement about date of invention in response to a motion for summary judgment, that I should be able to trust that statement. After all, it is a statement that's being made under oath. Well, Mr. Kepler, let's just cut to the chase, because her affidavit, the support, the claim of invention was simply a single conclusory statement that I invented, reduced to practice, examined, and tested my invention described in Claim 8 and confirmed that it had the properties described in the specification of the 810 patent before January 1, 1996. And there's nothing else, correct? That's correct. So there's no, you know, attached copy of a notebook or any other corroborating material whatsoever, simply this conclusory statement. Why was the district court not correct in concluding that that was insufficient to even raise a genuine issue of material fact? Well, first of all, I think it's because, first of all, the statement was made by the inventor. It was a statement of fact. But you know what our precedent is with respect to establishing dates of invention. I'm pretty clear and consistent about the necessity to have corroboration, and if that wasn't enough, I'm sure you appreciate that statements that are simply conclusory statements are very often not given great probative effect. And here there is nothing, nothing about how, when, who, why, nothing. The question for me when I was thinking about this is what was the burden? The burden on the non-moving party was to show that there was some genuine issue of material fact. Establishing an earlier date of invention requires some corroboration. Well, the question, I guess, that I ask myself is what corroboration, if any, is needed at the And I, the inventor's statement falls short of that test. Well, it raised an issue about the invention date, and there was no dispute on that. It was just attacked as being conclusory. But absent corroboration, you'd lose. So how was the material fact raised? When I was thinking about the question that you would ask me like that, I was thinking, I started thinking about what the value of having an individual sign a document and swear to it under penalty of perjury. And I was thinking about that in the same context of a motion for summary judgment and what the purpose of the summary judgment process is. And I think, and case law is not clear on this, when you have a motion for summary judgment and, well, when they have the facts that we have in this case, that the inventor's statement under oath is not enough to create a genuine issue of material fact that can then be, just can then be explored at trial. Do we trust our inventors or not? Do we trust people that sign the declarations or not? The case law suggests you have to have corroboration. It does suggest that you have to have corroboration. And there, there was a decision made to rely on the inventor's statement in light of any opinions that would indicate that that was not enough in these facts. So, if the, if that statement is enough, in this case, then Magistrate Kravchuk should have given it more weight. In Magistrate Kravchuk's opinion, she alluded to the standard. I mean, she clearly knew what the standard was. And then for some reason, when it came to this statement, it was disregarded without too much discussion. I can think of situations that I've had in my practice in which I have a client, an inventor or inventors who have told me what the date of invention was. And we always believe our clients. And the question comes in those situations is, do we have anything else other than that? I don't think it was an error in responding to this motion for summary judgment for the attorney to say, you know, here is a dispute. You know, dispute this in some way. Show me, show me that the inventor was in China. Show me that the inventor couldn't have done this. And nothing like that, that I can back to trust and privilege. My privilege is that I take my privilege seriously. If a court tells me something or if a client tells me something and they're going to sign a document, I'm going to take them at their word. I'm going to trust them. And I'm going to have to trust them. All right. Thank you, Mr. Dignan. Good morning, please. As this panel just alluded to, the critical date for purposes of invalidity either under anticipation or obviousness is under 102E is one year prior to the filing date of the patented issue, the 810 patent, which was filed on August 13, 1997. It's well stated in this court's precedent that a conclusory statement such as what was provided below in and of itself is insufficient to prove an earlier invention date, not just an invention date, but here an invention and reduction of practice to date because that's what's being claimed, not invention and diligence. So as a result, under 102E, which brings us to the Herman reference, Herman is prior art as it was filed on May 21, 1996. Now, the Herman reference discloses each and every limitation of Claim 8 of the 810 patent. For purposes of this appeal, Beyshaw, the plaintiff, acknowledges that the three layers of the liner are disclosed in Herman and takes exception with whether or not all of those layers of the liner are breathable. And they need to do this because if we just walk through the claims in the Herman patent, which is at A862 in the materials, Claim 1 of the Herman patent covers a layer for contact with said moisture, and we're at column 16, line 14, a cover layer, and a cover layer in Herman is defined as the layer closest to the skin, so here the foot. So we've got a cover layer for contact with said moisture and body fluids. Then we have a foam layer, hydrophilic, and hydrophilic is water-loving, so moisture is going to move in to the foam. There's record testimony from a plaintiff's own expert to that effect, that a hydrophilic foam is breathable and also brings moisture into it. So we have the second layer, a foam layer which is hydrophilic, where in the first side of the foam layer is bonded to the cover layer so that moisture or body fluids in contact with the cover layer closest to the foot are transferred through that layer to the foam layer. So we've got a transportation of the fluid, an active transportation, which is another requirement of Claim 8. And then when we go down to the third layer, is also disclosed in the claims, that's Claim 8 in Column 16, where in addition to the layer, the moisture transfer layer next to the foot, the breathable foam layer, now Claim 8 teaches that this composite material of Claim 1, the moisture transfer layer and the foam layer, also has a third layer which is a non-woven material that's bonded to the second side, remote from the cover layer. So that's exactly what we're looking at when we're looking at Claim 8 of the patented issue here, the 810 patent. Inner moisture transfer layer, breathable foam layer, and then the third layer is a non-woven. I just want to touch on it while we're here with the claims. One of the arguments that was made by plaintiffs in the brief was that the non-woven layer had to be non-breathable because it had to be thermoformed, or it was a molded article thermoformed. We'll look, but that's a further dependent claim. Claim 11 talks about the non-woven being, or sorry, Claim 10 talks about the non-woven material being a thermoformable polyester non-woven material. But Claim 8 clearly says that any type of non-woven falls within the claims here. And I don't want to overlook in Claim 4, the claims themselves also teach the addition of phase change materials to the foam at Line 34 where it says the layer composite material of Claim 1 wherein the foam layer further includes thermal phase change particles. I noticed that a lot of the debate here was about the breathability issue, and it's curious to me that you're not challenging the claim construction initially made by Judge Singal and sort of adopted for these proceedings. Is that correct? You're not challenging that understand or interpret? It would have been easier, would have reduced your burden if that breathability aspect was not construed as part of that claim. That's correct, Your Honor. But the claim doesn't say breathable. It doesn't, but the specification certainly teaches breathability through all of those layers, and it's an object of plaintiff's clearly. The whole purpose of the invention and what's taught is to come up with a composite layer that can be used in shoes or other devices to move moisture away from the foot. So I think we would lose that argument, and that's why we didn't challenge it. But let's look at Herman on that point because Herman clearly discloses, plainly discloses that moisture vapor needs to through the layers of the composite away from the foot, either expressly or inherently. And let's walk through. It seems to me as it describes throughout that it's not only transferring, but it's also dissipating. That's correct. And so what's really taught by Herman, we get hung up on the fact that our plaintiffs are arguing that the foam is used for storage and it's a reservoir. But that's a temporary. What Herman teaches is that's temporary. It moves, it uses absorbance into the foam to help pull the moisture away from the foot through the layer next to the foot where it's temporarily stored and dissipated. And it always uses and dissipated along the lines. Let's just look, for example, at the summary and object of the invention in column two at A855 where it says the present invention covers a composite material. And if we jump down to line 13, wherein the foam layer is bonded to the cover layer so that moisture or body fluids in contact with the cover layer are transferred through the cover layer to the foam layer, which absorbs, adsorbs, gels, and stores such body fluids and other moisture in contact with the cover where it is dissipated from the composite material. And throughout this specification, you jump down to line 33, 32.33, and the other moisture absorbed, adsorbed, gelled, or stored and dissipated. So it's the moisture is absorbed, adsorbed, gelled, or stored, but it's always dissipated by the composite material. And when we get to column five, it talks about dissipating in terms of evaporation. Column five lines, let's pick up at lines six, composite material acts to draw or transfer moisture or body fluids from and through the cover layer 11, which is closest to the foot, into the foam layer, which acts as a reservoir to absorb, gel, or store and dissipate such moisture or bodily fluid as by evaporation from or by washing of the composite material. After the moisture or body fluid is dissipated from time to time, the composite material can be reused. And I mean, come on. This is common sense. Any of us reading this knows that you're not going to have a closed system. You don't want your foot to re-wet. The moisture has to go somewhere. That's why we don't have plastic shoes on. That's why the clothes that we wear are breathable to some level or not. And what's interesting about Claim 8 in the 810 patent is it doesn't have an order of magnitude of breathability where you have to have an X percentage of breathability, and there's measures of that, or moisture vapor transfer. Any amount of breathability at all satisfies that claim. Any amount of moisture being evaporated through that layer satisfies the limitation. And Herman expressly teaches that the moisture can't be a closed system the way they argue. They're saying the moisture can't come out of the foam or can't go through the nonwoven, and clearly that's not taught. There's nothing in here that teaches that this hydrophilic breathable foam somehow doesn't allow moisture to escape from or the nonwoven. And in fact, if we look at column one of Herman at A855 at the bottom, let's pick up at line 61, the composite material so formed achieves advantageous results. For example, as an insole, it increases comfort for the user's foot by removing perspiration generated by the And moving on to the top of column two, by creating relatively cooler surface temperatures due to the removal of the moisture from the upper surface of the insole closest to the foot, so the moisture can't go back. It's got to go somewhere. It's dissipating, right? It teaches dissipation. And it also is teaching it's not dissipating back towards the foot. That makes no sense, and that's not what's taught here. And also at column six on this same point, it teaches not rewetting the cover layer, which is the layer closest to the foot. Column six, let's pick it up at the top, line one, the combination of the absorbent with the hydrophilic foam thus formed acts in composite materials of either two layers or multiple layers to absorb, adsorb, and gel the moisture drawn through the cover layer and to contain and store it so as to rewet the cover top layer of the composite. So it has to go somewhere. So either expressly or at least inherently, breathability is necessarily present in this patent. The moisture has got to go somewhere, and it doesn't go back towards the foot, so it has to leave out through composite materials. And with respect to the nonwoven, I mean, clearly Herman teaches that the foam layer is hydrophilic and breathable, so there might be a little doubt as to this nonwoven layer. But there's also teaching in Herman that suggests or tells us that the nonwoven is also permeable to water vapor. One, it states that the nonwoven has to take on the same characteristics of the foam layer and the rest of the composite, which requires dissipation, and that's at column eight, 22 through 25. And Herman also teaches that the nonwoven acts as a wick, and something that's wicking is actually bringing moisture vapor into it, and that is at column eight, 29 through 31. It should be noted that the nonwoven material may also be introduced as a component of the polyurethane foam layer. The addition of the nonwoven within the foam layer adds strength, minimizes shrinking and drying, and acts as a wick for moisture transpiration into the foam layer. So it's actually helping to pull the moisture into the foam layer away from the foot. And it also teaches that the nonwoven has voids and interstitial spaces. Let's look at column 11, lines 60 to 63. And here we're talking about the nonwoven, and it establishes that using the mixture that's taught here on how to make the foam nonwoven composite establishes that voids or interstitial spaces between the fibers and the nonwoven fibers or felted nonwoven fiber materials are used. Goes on to column 12 to talk about doing that will increase the extent of the voids or interstitial spaces in the fibers. And then it also directs us to diagrams for A, B, and C, which 22 are the interstitial spaces between the fibers of the nonwoven, 32A is the nonwoven material. So there's spaces in between the nonwoven material that are taught, and 23 in figure 4B are the voids that are in between 32A, those little black particles of the nonwoven. So Herman teaches that the nonwoven is porous, breathable, acts as a wick. That coupled with the fact that it has to be able to dissipate the moisture that's pulled through it and evaporate that moisture satisfies the breathability requirement. Now, if for some reason this court determines that the breathability limitation of Herman is not expressly or inherently disclosed, plainly it would be obvious here for a person skilled in the art to take Herman. And knowing what each of us even knows, common sense that we would like the breathable as opposed to having the moisture re-wet our foot would use a material in those two composites, either the foam layer or the nonwoven layer, to make it breathable. So it's an easy obviousness argument under KSR. And while we're on that, I just want to point out the 810 patent, the patented issue here, there's nothing really invented in here. It's a pure combination of known materials. If we look at Herman... All right. Thank you. Your time has expired. Thank you. Mr. Rivera-Simpson. In police court, I'm Dan Simpson. I'm an associate of John Kepler's. I think that we're getting caught up in things involving the Herman patent that aren't really the most critical. Though my client doesn't concede it, for the sake of this argument, I'll say, pretend for a second that the three individual layers in Herman are found in the 810 patent. That still doesn't matter because Herman teaches storage and dissipation. Moisture travels to the foam, never through the foam. Storage and dissipation is not the same as breathability. I'm glad that, Judge Leonard, you mentioned Judge Singleton's claim construction. He said, breathability is equivalent to being permeable to a water vapor. Well, the moisture that's dissipated, where does that come from? Where does it come from? It comes from the foam layer. The moisture enters through the non-woven layer closer to the skin into the foam where it is stored. That's what a phase change material is liquid to some other phase. But that sounds like it's being transported through. In that sense, is it not breathable? Not necessarily, sir. It's not being trapped and entrained and maintained within the foam layer? Actually, sir, I believe it is. There's a temporal disconnect between storage and dissipation and breathability. Just because it's dissipated doesn't mean it goes out the opposite end. That's the real key. When you look at Judge Singleton's claim construction, it has to travel through. Nothing in the claim that says it has to do certain things at a certain time. It just talks about whether the structure recited is present and whether it is a breathable composite. I agree wholeheartedly. That's why Judge Singleton's claim construction is so important because the water vapor has to transfer through the liner as opposed to being stored and dissipated. It is a serious difference. Whether it's stored in the liner for minutes or hours or days, it doesn't matter. It's not truly breathable. It's not an active movement. As the non-moving party in summary judgment, all that my client has to do is show a genuine issue. We believe that the genuine issue is as to whether or not the burden for the appellees in this case is to show up by clear and convincing. Clearly, they have not met this burden with respect to just the breathability issue. Given that, this issue on the Herman patent is ripe for reversal. As to the obviousness argument, this court doesn't normally hear arguments that were not addressed by the lower court for the first time on appeal, which is what we're dealing with now. Obviousness is there's no judgment below to look at. This court is going to be reviewing affidavits and individual pieces of evidence, which as we've set out in our brief in the limited space we've had because this was a mooted issue and there were so many issues on appeal. We've set out that we don't believe that these affiants are reliable. They're all interested parties. All of them are tied to the same company that has a direct interest in this case. And each individual piece of evidence showing prior invention of this Eclipse fabric and of this TRF3 fabric, these are all things that the magistrate judge below had a chance to evaluate when looking at the TRF3 product and determining that it was not an anticipatory product. These are all things that this court would have to review for the first time now on appeal. And we don't see any reason to do that here now for the first time. And really briefly, we also mentioned in our brief that the Alpine TRF3 product is not anticipatory. The magistrate judge did rule correctly on that point. The only evidence that was presented in support of that anticipation argument was an affidavit by an interested party and it was not sufficiently corroborated and there was no way for the court to know truly what that material was and how it existed prior to the filing date of my client's patent. There's also the issue as to whether or not the material has changed from its original pre-filing date form to the form that was examined by our expert in this case. If there's no further questions, I believe I'll wait the remainder of my time. Thank you very much.